**Affirmed in part; Reversed in part; and Remand; Opinion Filed November 4, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01752-CV

### STUTZ ROAD LIMITED PARTNERSHIP AND WILLIAM D. WHITE, III AND LEN-MAC DEVELOPMENT CORPORATION, Appellants
### V.
### WEEKLEY HOMES, L.P. D/B/A DAVID WEEKLEY HOMES AND PRIORITY DEVELOPMENT, L.P., Appellees

**On Appeal from the County Court at Law No. 2
Dallas County, Texas
Trial Court Cause No. CC-10-01696-B**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Myers
Opinion by Justice Myers

This case concerns a real estate development agreement and promissory notes that were to be paid with the proceeds from the agreement. After offsetting awards of damages and attorney's fees to various parties, the trial court rendered judgment of $9,336.91 to Len-Mac Development Corporation against Priority Development, L.P. Appellants Len-Mac Development Corporation, Stutz Road Limited Partnership, and William D. White, III, and cross-appellant Priority Development, L.P., bring issues contending the trial court erred in its rulings on motions for summary judgment and motion for judgment notwithstanding the verdict, the court's calculation of damages, the court's award of attorney's fees, and the court's order

granting judgment on a motion to assign collateral. We affirm the trial court's judgment in part and reverse in part.

## BACKGROUND

William White is a residential real estate developer through his company, Len-Mac. In previous developments before the one at issue, White would select raw land for development, recruit investors, and obtain a bank loan for the purchase price of the property and the cost of developing the land. White would develop the property to prepare it for homebuilders by building the streets for the community and bringing in the utilities. White would then sell the lots to Weekley Homes, L.P., which would build homes on the lots and sell them to homebuyers.

In 2003, White determined that a piece of property called Wyrick Estates[1] could be a good residential development project. White approached executives at Weekley to see if Weekley would be interested in building homes in Wyrick Estates. Weekley was interested, and its executives told White they could use Weekley's sister company, Priority Development, L.P., which would eliminate the need for White to obtain financing for the project and recruit other investors.

In February 2005, White, through Len-Mac, entered into a Residential Development Agreement with Priority for development of residential lots in Wyrick Estates. Under this agreement, Priority would obtain the financing for the project and would purchase and own the property. Len-Mac would perform the work to convert the raw land into lots ready for homebuilding. Priority would then sell the lots to Weekley Homes. Priority would reimburse Len-Mac for all the costs of developing the property. Additionally, Priority would pay Len-Mac a "Fixed Fee" of $12,000 a month for eighteen months (a total of $216,000) as well as a

---

[1] The development was ultimately called Enclave at Wyrick Estates. However, the parties also called it Enclave at Dixon Branch. We refer to the property as "Wyrick Estates" regardless of how the parties referred to it in particular documents.

"Contingent Fee" consisting of sixty percent of the "Project Available Cash." The Project Available Cash was all the revenues from the project, such as the sale of lots to Weekley Homes, minus the acquisition and development costs of the project.

After Priority and Len-Mac executed the Residential Development Agreement, Priority entered into a lot-purchase agreement with Weekley whereby Weekley agreed to purchase twelve lots per quarter at certain prices. In addition, the prices in the lot-purchase agreement would increase by six percent per year. Under this agreement, Weekley put up $10,000 of earnest money for the right to purchase the lots. If Weekley purchased the lots timely for the prices in the lot-purchase agreement, then Priority would receive $10,190,100 for the 134 platted lots. The lot-purchase agreement provided that if Weekley defaulted on the agreement, then Priority's only remedies were either to extend the time for Weekley to comply or to cancel the lot-purchase agreement and keep the earnest money.

Priority's lender, GMAC, agreed to loan Priority Development the money for the purchase of the property and its development as part of Priority's $50 million line of credit. Unbeknownst to White and Len-Mac, this line of credit also provided the funds for other of Priority's real estate developments. The line of credit was "cross-collateralized," meaning the property in each of the different developments served as collateral for the entire line of credit. The cross-collateralization of Priority's loan with GMAC was not mentioned in any of the documents signed by White or to which he had access.

At the time they entered into the Residential Development Agreement, White calculated that if the project met the budget and Weekley Homes purchased all the lots pursuant to the lot-purchase agreement, then the Project Available Cash would be $2,721,287, and Len-Mac's Contingent Fee would be $1,632,772.

The development of the lots was substantially completed on March 6, 2006, and Weekley began to purchase lots from Priority in accordance with the schedule in the lot-purchase agreement.

In November 2006, White needed money for personal reasons, so on November 30, 2006, Len-Mac borrowed $250,000 from Priority Development. The promissory note (the "Len-Mac Note") stated the interest would be paid quarterly. The principal, however, would be paid from the contingent fee owed to Len-Mac from the Residential Development Agreement. The note stated that Priority was to retain eighty percent of the contingent fee as payments on the principal. Any outstanding principal plus unpaid interest on the note was to be due and payable in full on June 1, 2008, later extended to July 1, 2009. The note was secured by Len-Mac assigning Priority a security interest in Len-Mac's interest in the Residential Development Agreement and by a guaranty of payment signed by White. Len-Mac made two interest payments on the note in 2007 covering most of the first six months' interest, but Len-Mac made no other direct payments on the note.

In 2007, White wanted to purchase additional real estate to develop for residential housing, and he created a limited partnership, Stutz Road, L.P., to purchase the property. On June 5, 2007, Stutz Road borrowed $600,000 from Priority to purchase the property. This note (the "Stutz Road Note") provided that both principal and interest would be paid from the contingent fee owed to Len-Mac under the Residential Development Agreement. As with the Len-Mac Note, White guaranteed the Stutz Road Note, and Len-Mac signed a new assignment of a security interest in the Residential Development Agreement. This assignment authorized Priority to retain eighty percent of the contingent fee to pay both notes and stated that the retained contingent fee would be used first to pay off the Len-Mac Note and then be used to pay

the Stutz Road Note. The Stutz Road Note had a maturity date of November 30, 2008, when all principal and interest would be due and payable in full.

In 2007 and 2008, a significant downturn in the housing market occurred. By late 2008, Priority was having financial difficulties due to the housing market crisis. Priority's practice with GMAC was that it would present the workmen's bills to GMAC, and GMAC would provide the money to pay those bills as part of the loan. In late 2008, Priority had bills of $800,000 to be paid on the developments, including Wyrick Estates, but GMAC stopped funding the loan. Priority used all of its excess cash to pay the bills and then had to cease work on the developments. At the same time, homes stopped selling, and Weekley's purchases of lots slowed dramatically.[2] With little money coming in, Priority had insufficient income to meet its debt obligations. Priority began discussions with GMAC about how to solve Priority's debt crisis; Priority owed GMAC $20 million. In late 2008, GMAC posted Wyrick Estates and the other properties collateralizing the loan for foreclosure.

In April 2009, Priority reached an agreement with GMAC resolving the debt. Under the agreement, Priority paid GMAC $10 million cash and transferred some of its other developments to GMAC on which Priority had allocated $10 million of its borrowing. To pay the $10 million cash to GMAC, Priority borrowed the money from Weekley, using development projects, including the remaining lots in Wyrick Estates, as collateral. This loan came due in 20 days. When Priority was unable to repay the cash to Weekley, it transferred Wyrick Estates and the other developments to Weekley. The agreement transferring the developments to Weekley allocated $2,767,120 of value to the remaining lots in Wyrick Estates.

---

[2] Weekley had difficulty selling the lots it purchased from Priority. In 2006, Weekley purchased 39 lots and sold 22 houses, leaving a surplus of 17 lots. In 2007, Weekley purchased 34 lots and sold 23 houses, leaving Weekley with a surplus of 28 lots. In November 2007, Weekley notified Priority Development that 7 lot purchases per quarter was "more realistic" than 12. In 2008, Weekley purchased only 4 lots and sold 11 houses, leaving it with a surplus of 21 lots. If Weekley had followed the schedule in the lot-purchase agreement, it would have purchased 57 more lots than it did through 2008. On March 30, 2009, Priority and Weekley agreed to terminate the lot-purchase agreement. This termination agreement permitted Priority to keep the $10,000 in earnest money deposited by Weekley.

Priority never paid any amount to Len-Mac as the contingent fee, nor did it apply any amount of the contingent fee to the notes.

## THE LITIGATION

In March 2010, Len-Mac sued Weekley and Priority asserting tort and contract claims concerning the development project, the Residential Development Agreement, and Priority's failure to pay the contingent fee. Priority filed a counterclaim against Len-Mac and White seeking payment of the Len-Mac Note. Priority then filed a separate lawsuit against Stutz Road and White seeking payment of the Stutz Road Note. Stutz Road and White filed counterclaims against Priority for breach of the Residential Development Agreement and various tort claims. The two lawsuits were later consolidated.

Priority moved for summary judgment as to liability only on the two notes and White's guaranties. The trial court granted the motion, ordered that Len-Mac and Stutz Road were liable on their notes and White was liable on the guaranties, and stated that the amount of unpaid principal and interest under the notes was a disputed issued to be decided at trial. The trial court also granted Priority and Weekley's motion for summary judgment on Stutz Road and White's counterclaims.

The case was tried before a jury on Priority's suit on the notes and guaranties and on Len-Mac's claims. At the conclusion of the trial, the trial court granted Priority and Weekley's motion for directed verdict on several of Len-Mac's claims. The court also entered a directed verdict on the amount due on the notes, determining the full amount of the principal, $250,000 on the Len-Mac Note and $600,000 on the Stutz Road Note, was due and awarding interest on the principal through the day of trial. The trial court submitted a single issue to the jury asking, "How much is the Contingent Fee . . . ?" The jury answered $1,037,000. The court determined the amount of attorney's fees to award all the parties and then offset the various awards. After

offsetting the awards, the net amount was $9,336.91 due Len-Mac from Priority, and the trial court granted judgment to Len-Mac against Priority for that amount.

## ISSUES ON APPEAL

Stutz Road and White bring three issues contending the trial court erred by (1) granting Priority's motion for partial summary judgment determining that Stutz Road and White were liable on the Stutz Road Note; (2) granting Priority's motion for summary judgment dismissing Stutz Road and White's counterclaims for breach of contract, fraud, and breach of fiduciary duty; and (3) granting Priority's motion for directed verdict for the amount owed on the Stutz Road Note and offsetting the damages for the breach of the note against the contingent fee found by the jury.

Len-Mac brings two issues. Its first issue asserts the trial court erred in its calculation of the amount owing on the Len-Mac Note, and its second issue asserts the trial court erred by granting Priority's motion for judgment on the collateral assignment of the Residential Development Agreement.

Priority brings two cross-issues contending (1) the trial court erred by denying Priority's motion for judgment notwithstanding the verdict on the jury's determination of the amount of the contingent fee under the Residential Development Agreement; and (2) the trial court erred by awarding Len-Mac its attorney's fees.

## SUMMARY JUDGMENT ON LIABILITY FOR THE STUTZ ROAD NOTE

In their first issue, Stutz Road and White contend the trial court erred by granting Priority Development's motion for partial summary judgment on its claims against them for breach of the Stutz Road Note and White's guaranty of that note. In the motion, Priority Development sought summary judgment that Stutz Road was liable on the note and White was liable on the guaranty. Priority did not move for summary judgment on the amount of damages, i.e., the amount of

–7–

principal and interest owed on the note. The trial court granted the motion for partial summary judgment and ordered that Stutz Road was liable on the note and White was liable on his guaranty of the note.

The standard for reviewing a traditional summary judgment is well established. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985); *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 825 (Tex. App.—Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon*, 690 S.W.2d at 549; *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.*, 12 S.W.3d 172, 175 (Tex. App.—Dallas 2000, pet. denied).

To establish Stutz Road's liability on the Stutz Road Note, Priority had the burden of proving the note in question, that Stutz Road signed the note, that Priority was the legal owner and holder of the note, and that a balance was due and owing on the note. *See TrueStar Petroleum Corp. v. Eagle Oil & Gas Co.*, 323 S.W.3d 316, 319 (Tex. App.—Dallas 2010, no pet.). Stutz Road and White assert that Priority failed to prove the last element, that a balance was due and owing on the note. They do not contest that Priority conclusively proved the other elements.

The note set out how the principal and interest were to be paid:

Principal and Interest Payments:

Principal and Interest accrued in accordance with this Note shall be repaid from Contingent Fees earned and payable to Len-Mac Development Corp ("LMDC") in accordance with the terms of Article V of that certain Residential Development Agreement dated February 15, 2005 (the "RDA") by and between LMDC and Lender. In accordance with the terms and provisions of a Collateral Assignment of LMDC's interest in the RDA to Lender dated June 5, 2007, Lender will retain Contingent Fee payments that become due on the RDA as payments from Borrower. Such payments will be applied first to accrued but unpaid interest and then to principal.

The note also stated that the unpaid principal and accrued but unpaid interest "shall be due and payable in full on November 30, 2008." The note was secured by Len-Mac's "Collateral Assignment of Interest in Residential Development Agreement," in which Len-Mac granted Priority a security interest in all of Len-Mac's "rights, title and interest" under the Residential Development Agreement. The collateral assignment authorized and instructed Priority to retain 80 percent "of each Contingent Fee payment that would be paid to Pledgor [Len-Mac] under the [Residential Development] Agreement." The assignment stated that the retained contingent fee was to be used first to pay the Len-Mac Note in full and then used to pay the Stutz Road Note.

In its motion for summary judgment, Priority stated and presented evidence that the note had matured but Stutz Road had not made any payments on the note. Priority did not address the note's statement that the indebtedness would be paid from the contingent fee retained by Priority that would otherwise have been paid to Len-Mac. White testified that no contingent fee had been paid to Len-Mac. Because the note permitted the loan to be paid from the contingent fee retained by Priority under the Residential Development Agreement, Priority's assertion in the motion and its summary judgment evidence that Stutz Road had not made any payments on the note did not conclusively establish that an amount was due and owing under the note. If 80 percent of the contingent fee would have been sufficient to pay the $250,000 principal and all

–9–

accrued interest under the Len-Mac Note as well as the $600,000 principal and all accrued interest under the Stutz Road Note, then no balance would have been due and owing under the Stutz Road note, the note would not have been in default, and White would have had no liability under his guaranty of the Stutz Road Note. Because Priority's motion for summary judgment and summary judgment evidence did not address the contingent fee, its motion for summary judgment failed to prove conclusively the element that a balance was due and owing under the Stutz Road Note. We conclude the trial court erred by granting Priority's motion for summary judgment as to Stutz Road's liability on the Stutz Road Note and White's liability on his guaranty of the note.

Although we conclude the trial court erred by granting the motion for summary judgment on Stutz Road's liability on the Stutz Road Note and White's liability on his guaranty of the note, we cannot reverse unless the error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1). In this case, the error would not cause the rendition of an improper judgment if Priority proved at trial that the amount of the contingent fee it was authorized to retain (80 percent of the total contingent fee) was not sufficient to pay the principal and interest of both notes at the time the contingent fee became payable to Len-Mac.

The jury found that "the Contingent Fee" under the Residential Development Agreement was $1,037,000.[3] It was undisputed that Priority did not make any payment of the contingent fee to Len-Mac. Therefore, any contingent fee earned under the Residential Development Agreement was retained by Priority. The collateral assignment authorized Priority to retain 80 percent of the contingent fee and to apply it to the two promissory notes. The contingent fee was 60 percent of the amount by which the receipts from the project exceeded the acquisition and

---

[3] As discussed below, no evidence supported the jury's finding that the contingent fee was $1,037,000. All the evidence of the contingent fee showed it was, at most, less than half that amount. However, for purposes of this issue, we apply the jury's finding of the contingent fee, because even using this unreasonably high calculation for the contingent fee, the portion of the fee to be allocated to payment of the notes was not sufficient to pay them.

–10–

development costs. The evidence presented at the trial established that the receipts did not exceed the costs until Priority transferred the last 52 lots to Weekley in April 2009. There was no evidence that the receipts exceeded the costs before that date and no evidence that Weekley had any receipts after that date. Therefore, if 80 percent of the contingent fee did not exceed the amounts due and owing on the two promissory notes in April 2009,[4] then the trial court's error in granting summary judgment on Stutz Road's and White's liability on the Stutz Road note and its guaranty will have been harmless.

At trial, Priority introduced amortization tables for both notes. Those tables showed that in April 2009, there was $282,369.32 in principal and interest owing on the Len-Mac Note, $688,908.33 in principal and interest owing on the Stutz Road Note, and the total principal and interest on both notes was $971,277.65. At the trial, the jury was asked only one question: "How much is the Contingent Fee (Paragraph 5.03 of Defendant's Exhibit 33 [the Residential Development Agreement]), if any?" The jury answered, "$1,037,000." Eighty percent of $1,037,000 is $829,600, which is less than the amount owing on the two notes. In fact, it is less than the $850,000 of principal owed on the two notes.

Because the evidence at trial conclusively established that the amount of the contingent fee Priority was authorized to retain and apply to the promissory notes was less than the amount owed on the notes, the evidence conclusively established there was a balance due on the Stutz Road Note. The trial court's error in granting summary judgment on Stutz Road's liability on the Stutz Road Note and White's liability on the guaranty of that note did not cause the rendition

---

[4] We make no determination of when the contingent fee should have been applied to the notes and paid to Len-Mac. The Residential Development Agreement stated the contingent fee was due "No later than twenty (20) days following the closing of each calendar month's accounting records at the end of which month there is Project Available Cash." The agreement transferring the lots to Weekley and allocating $2,767,120 to their value occurred on April 30, 2009. The record does not show when the accounting records for April 2009 closed, and no party contends they did not close. However, the contingent fee could not have been payable before the April 30, 2009 agreement transferring the lots from Priority to Weekley. Therefore, the April 30 date represents a best-case scenario for Len-Mac, Stutz Road, and White because the interest due on the notes would have been lower than at any other date.

–11–

of an improper judgment. Therefore, the error is not reversible. We overrule Stutz Road and White's first issue.

**SUMMARY JUDGMENT ON STUTZ ROAD AND WHITE'S COUNTERCLAIMS**

In their second issue, Stutz Road and White contend the trial court erred by granting Priority's no-evidence motion for summary judgment on their counterclaims.

We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See* TEX. R. CIV. P. 166a(i); *Flood v. Katz*, 294 S.W.3d 756, 762 (Tex. App.—Dallas 2009, pet. denied). Thus, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *See id.* When analyzing a no-evidence summary judgment, we consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)). A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

–12–

**Breach of Contract**

Stutz Road and White first complain that the trial court erred by granting Priority's motion for summary judgment on their claim for breach of contract.[5] In their pleading, Stutz Road and White asserted they were third-party beneficiaries of the Residential Development Agreement and that Priority breached the Residential Development Agreement by failing to use the contingent fee to pay the Stutz Road Note. Priority's motion for summary judgment asserted there was no evidence that Stutz Road and White were third-party beneficiaries of the Residential Development Agreement.

Neither Stutz Road nor White were parties to the Residential Development Agreement, and Stutz Road did not exist when the Residential Development Agreement was executed and took effect. "A third party may recover on a contract made between other parties only if the parties intended to secure a benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit." *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (per curiam). "A third party does not have a right to enforce the contract if [the party] received only an incidental benefit." *Id.* "A court will not create a third-party beneficiary contract by implication." *Id.* (quoting *MCI Telecomms. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)). "Rather, an agreement must clearly and fully express an intent to confer a direct benefit to the third party." *Id.* "To determine the parties' intent, courts must examine the entire agreement when interpreting a contract and give effect to all the contract's provisions so that none are rendered meaningless." *Id.*

---

[5] The trial court's order stated that Priority's motion for summary judgment on Stutz Road and White's counterclaims was granted, and it "**ORDERED** that the following counterclaims asserted by Stutz [Road] and White . . . are hereby dismissed with prejudice: fraud, civil conspiracy, breach of fiduciary duty, accounting, and statutory fraud." According to this order (and Stutz Road and White do not cite to any other order as dismissing their breach of contract counterclaim), the trial court did not dismiss their breach of contract counterclaim. However, the parties and the trial court treated the order as having dismissed this counterclaim. In the interest of justice, we address Stutz Road and White's arguments concerning that counterclaim.

Priority's motion for summary judgment asserted "there is no evidence that (a) the contracting parties (Priority and Len-Mac) intended to secure a benefit for White or Stutz [Road]; or (b) that the contracting parties entered into the contract directly for White or Stutz [Road]'s benefit."

Stutz Road and White argue on appeal, "There was an expressed intent to confer a direct benefit on Stutz Road by the inclusion of Priority Development's obligations under the RDA, and more than a scintilla of evidence existed regarding same." The note and the assignment of collateral granting Priority a security interest in the Residential Development Agreement express an intent that Priority retain 80 percent of the contingent fee that would be owing to Len-Mac and put that toward payment of the two promissory notes. However, this is not evidence that Len-Mac and Priority entered into the Residential Development Agreement for the benefit of Stutz Road and White. Stutz Road did not exist and White's status as guarantor of the Stutz Road Note did not exist when Len-Mac and Priority entered into the Residential Development Agreement.

To the extent Stutz Road and White may be arguing the Stutz Road Note, assignment of collateral, and White's guaranty modified the Residential Development Agreement creating an express intent in the modified agreement that the Residential Development Agreement benefit Stutz Road and White, we disagree. The Residential Development Agreement states, "This Agreement may not be modified or amended except in writing signed by both parties hereto." Priority did not sign the Stutz Road Note, the guaranty, or the assignment of collateral. Therefore, those documents did not modify the Residential Development Agreement.

We conclude the trial court did not err by granting Priority's no-evidence motion for summary judgment on Stutz Road and White's cause of action for breach of contract.

–14–

## Fraud

Stutz Road and White contend the trial court erred by granting Priority's no-evidence motion for summary judgment on their claim for fraud. In its motion for summary judgment, Priority asserted "there is no evidence that Priority made any false statements to Stutz [Road] or White (in his individual capacity)."

One of the elements of fraud that Stutz Road and White had the burden of proving was that Priority "made a material misrepresentation," i.e., a false statement. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011) (elements of fraud); *Misrepresentation*, BLACK'S LAW DICTIONARY 1152 (2014) (defining "misrepresentation" as meaning "an incorrect, unfair, or false statement"). In their counterclaim, Stutz Road and White alleged, "Priority Development made false statements to [Stutz Road and White] regarding the sufficiency of funds available from the sale of the Lots pursuant to the Agreement for Sale and Purchase of Lots between Priority Development and Weekley Homes, L.P. for securement of the Promissory Note and Guaranty." On appeal, Stutz Road and White assert they "provided the trial court with evidence that Priority Development falsely represented the sufficiency of funds from which payment was to be contractually made." They cite generally to White's affidavit and deposition and the affidavit of his accountant and lawyer, Daniel Schreimann, but they do not identify any particular statements in those documents as constituting evidence of the misrepresentations. We have reviewed those documents, and we have found no evidence of a representation by Priority that 80 percent of the contingent fee would be sufficient to pay the Stutz Road Note.[6]

---

[6] If those representations are somewhere in those documents, then Stutz Road and White's citation to the documents generally and not to the specific page or pages where they appear in the record fails to comply with the requirement of TEX. R. APP. P. 38.1(i) that parties make "appropriate citations . . . to the record." *See Leija v. Laredo Comty. Coll.*, 04-10-00410-CV, 2011 WL 1499440, at *5 (Tex. App.—San Antonio Apr. 20, 2011, no pet.) (mem. op.) ("When a summary judgment respondent fails to direct the reviewing court to specific summary judgment evidence, a fact issue cannot be raised sufficient to defeat summary judgment."); *Arredondo v. Rodriguez*, 198 S.W.3d 236, 238–39 (Tex. App.—

–15–

Stutz Road and White also assert on appeal that Priority represented "that it was accounting and applying payment to the Stutz Road Note as agreed"; and "that it was properly and diligently complying with its obligations as to the contingent fees . . . ." They cite generally to White's deposition and Schreimann's affidavit in support of their assertion that Priority made these representations. White's deposition and Schreimann's affidavit contain no evidence that Priority represented it was accounting for the contingent fee and applying it to the Stutz Road Note.

We conclude the trial court did not err by granting Priority's motion for summary judgment on Stutz Road and White's claim of fraud.

## Breach of Fiduciary Duty

Stutz Road and White also contend the trial court erred by granting Priority's no-evidence motion for summary judgment on their claim for breach of fiduciary duty. Priority asserted in its motion for summary judgment "there is no evidence Priority owed a fiduciary duty to Stutz [Road] or White."

Stutz Road and White argue they were "joint adventurers" with Priority because the note and collateral assignment provide that repayment of the loan was to be from the contingent fee. Parties in a joint venture owe a fiduciary duty to one another. *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 550 (Tex. 1998). A joint venture has four elements: (1) a community of interest in the venture, (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. *Ayco Dev. Corp. v. G.E.T. Serv. Co.*, 616 S.W.2d 184, 186 (Tex. 1981); *Smith v. Deneve*, 285 S.W.3d 904, 913 (Tex. App.—Dallas 2009, no pet.). Even if Stutz Road and White had an interest in the Residential Development

San Antonio 2006, no pet..) (court reviewing a summary judgment is not required "to wade through a voluminous record to marshal respondent's proof" to determine whether the respondent carried its burden; "[a]n appellant has a duty to show that the record supports its contention").

Agreement and had agreed with Priority to share its profits, there is no evidence that Stutz Road and White agreed to share in any losses incurred under the Residential Development Agreement or that they had any right of control or management under the Residential Development Agreement. There is no evidence that Stutz Road and White were in a joint venture with Priority.

We conclude Stutz Road and White presented no evidence that Priority owed them a fiduciary duty. Accordingly, the trial court did not err by granting Priority's motion for summary judgment on Stutz Road and White's claim for breach of fiduciary duty.

We conclude the trial court did not err by granting Priority's no-evidence motion for summary judgment on these counterclaims. We overrule Stutz Road and White's second issue.

## DAMAGES

Len-Mac, Stutz Road, White, and Priority complain of the trial court's award of damages. Len-Mac asserts in its first issue and Stutz Road and White in their third issue that the trial court erred by offsetting the contingent fee found by the jury against the amounts owed on the notes on the day of trial instead of applying the contingent fee to the notes when the fee would otherwise have been payable to Len-Mac, which would have reduced the amount of interest accrued on the notes. Priority contends in its first cross-issue that the evidence is insufficient to support the jury's finding that the amount of the contingent fee under the Residential Development Agreement was $1,037,000. We address Priority's cross-issue first.

### Amount of the Contingent Fee

In its first cross-issue, Priority contends the trial court erred by denying its motion for judgment notwithstanding the verdict and by rendering judgment based on the jury's finding of the contingent fee. Priority asserts the jury disregarded the evidence and failed to calculate the contingent fee using the method set out in the Residential Development Agreement.

We review a trial court's decision whether to grant a motion for judgment notwithstanding the verdict under a no–evidence standard, examining whether any evidence supports the jury's findings. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (test for legal sufficiency is same for summary judgment, directed verdict, JNOV, and appellate no–evidence review). No evidence exists when there is:

> (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of a vital fact.

*Gharda USA, Inc.*, 464 S.W.3d at 347 (quoting *City of Keller*, 168 S.W.3d at 810). We review only the evidence tending to support the jury's verdict and "must disregard all evidence to the contrary." *Id.* (quoting *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990)). We consider the evidence and possible inferences in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.*; *City of Keller*, 168 S.W.3d at 822. We will uphold the jury's finding if more than a scintilla of competent evidence supports it. *Gharda USA, Inc.*, 464 S.W.3d at 347; *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009). "More than a scintilla of evidence exists when the evidence supporting the finding 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Gharda USA, Inc.*, 464 S.W.3d at 347 (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)).

In this case, the jury was asked, "How much is the Contingent Fee (Paragraph 5.03 of Defendant's Exhibit 33), if any?" Defendant's Exhibit 33 was the Residential Development Agreement. Although the jury was not asked to find an amount of damages, the standards for reviewing damages findings are helpful in this case because, like a finding of damages, the question required the jury to calculate a number based on its analysis of the evidence.

–18–

The jury generally has broad discretion to award damages within the range of evidence presented at trial. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2000). When a precise method for determining damages is presented, the jury may not arbitrarily assess an amount not authorized or supported by the evidence. *See First State Bank of Keilman*, 851 S.W.2d 914, 931 (Tex. App.—Austin 1993, writ denied). In other words, the verdict must fall within the range of the evidence presented, and a jury may not "pull figures out of a hat" in assessing damages. *See CCC Grp., Inc. v. S. Cent. Cement, Ltd.*, 450 S.W.3d 191, 200 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

The Residential Development Agreement stated the "Contingent Fee" was "sixty percent (60%) of Project Available Cash." The agreement defined Project Available Cash as meaning:

> *all receipts derived from the conduct of the business of the Project, and proceeds from the sale of all or any portion of the Project whether by sale of lots or otherwise, reduced by such amounts as are necessary (a) to repay Acquisition Costs and Development Costs incurred to date,* and (b) to provide reserves for the reasonable needs of the business of the Project as Owner [Priority] and Developer [Len-Mac] mutually agree to in writing, including, without limitation, estimating future Development Costs and future principal and interest payments associated with acquisition and development debt included in Acquisition Costs. (If the parties disagree on the need for a reserve or its size, the cash involved in the dispute shall not be distributed pending resolution of the dispute.) At any time, Developer may make a written request of Owner to make a determination of Project Available Cash within ten (10) days of such request. For purposes of determining Project Available Cash, no more than $285,000 shall be included as Development Costs over the lifetime of the Project for end-of-year ad valorem tax payments due with respect to unsold Lots. The foregoing cap does not apply to ad valorem taxes that are prorated to (and thus paid by) Owner in connection with any sale of Lots, however.

(Emphasis added.) In short, Project Available Cash was receipts from the business minus acquisition and development costs and any necessary cash reserve. Because all the lots have been transferred and the acquisition and development costs have all been paid, no cash reserve is necessary. Therefore, the Project Available Cash is the receipts minus the acquisition and development costs, and the contingent fee is 60 percent of that number.

The receipts for the business consisted of $6,391,586.42 for the lots sold to Weekley through February 5, 2009, and $2,767,120 for the lots transferred to Weekley on April 30, 2009 to pay back the $10 million loan from Weekley. These receipts total $9,158,706.42.[7] The amount of the acquisition and development costs was disputed: Priority maintained the costs were $8,904,601; White testified those costs were $8,339,000. Using Priority's calculation of the costs, the Project Available Cash would be $9,158,706.42 minus $8,904,601, which equals $254,105.42; 60 percent of that amount, $152,463.25, would be the contingent fee. Using White's calculation of the costs, the Project Available Cash would be $9,158,706.42 minus $8,339,000, which equals $819,706.42, and the contingent fee would be $491,823.85. However, none of the amounts in evidence for Priority's receipts or the acquisition and development costs would have permitted the jury to get anywhere near the contingent fee it found of $1,037,000. We agree with Priority that no evidence supported the jury's finding.

Len-Mac argues the jury's finding should be interpreted as damages caused by Priority's multiple breaches of the Residential Development Agreement, including transferring the last 52 lots to Weekley for only $2,767,120 when they were worth $4,000,000. Using that figure would raise Priority's receipts to $10,391,586.42, and using White's figure for the acquisition and development costs, $8,339,000, would result in Project Available Cash of $2,052,586.42 and a contingent fee of $1,231,551.85, which exceeds the jury's finding of the contingent fee. The argument lacks merit because the jury's finding cannot be interpreted as damages.[8] The jury question was clear: "How much is the Contingent Fee (Paragraph 5.03 of Defendant's Exhibit 33), if any?" The jury was not asked to determine the amount of Len-Mac's damages for

[7] The parties' calculations apparently do not include the $10,000 earnest money received by Priority from Weekley when the lot-purchase agreement was terminated. We make no determination whether that amount should be included in the determination of "all receipts derived from the conduct of the business of the Project."

[8] Len-Mac also states in its brief, "The jury determined that [sic] breached the RDA." Presumably, Len-Mac means the jury determined that Priority breached the Residential Development Agreement. However, the jury was not asked to determine whether Priority breached the agreement, and it made no such determination.

breach of the Residential Development Agreement. The jury's answer can be interpreted only as the contingent fee under the Residential Development Agreement, which is expressly defined as 60 percent of the difference between Priority's receipts and the acquisition and development costs. The record does not support Len-Mac's argument that the jury's finding was for damages and was not limited to the contingent fee as defined in the Residential Development Agreement.

Although no evidence supports the jury's finding of $1,037,000 for the contingent fee, we cannot substitute a finding unless the evidence conclusively establishes the amount of the contingent fee. *See Favaloro v. Comm'n for Lawyer Discipline*, 994 S.W.2d 815, 823 (Tex. App.—Dallas 1999, pet. struck). In this case, the amount of the contingent fee is not conclusively established and remains a fact question because of the conflicting testimony concerning the amount of the acquisition and development costs. The parties' testimony concerning the amount of the acquisition and development costs varies by $565,601, resulting in a difference of $339,360.60 in the contingent fee using the different acquisition and development costs. We conclude the trial court erred by rendering judgment based on the jury's verdict. We sustain Priority's first cross-issue.

**Calculation of Damages**

In Len-Mac's first issue and Stutz Road and White's third issue, those parties contend the trial court erred by granting a directed verdict as to the amount of Priority's damages for the breaches of the notes and White's guaranties.

In rendering judgment, the trial court took the amount of the contingent fee found by the jury, added an award of attorney's fees to Len-Mac, and then subtracted the principal and

interest owed on both notes as of the day of trial and the awards of attorney's fees to Priority. This resulted in a net judgment for Len-Mac against Priority of $9,336.91.

Len-Mac, Stutz Road, and White argue that the contingent fee should have been applied to the notes at the time the fee would otherwise have been payable to Len-Mac. They assert that doing so would have reduced the amount of principal and interest owing on the notes. They are correct in part: the trial court should have apportioned to the notes the amount of the contingent fee authorized to be retained toward payment of the notes at the time the contingent fee would otherwise have been payable to Len-Mac. That amount of the contingent fee was 80 percent of the contingent fee, not the entire contingent fee. According to the terms of the notes and the collateral assignments, 80 percent of the contingent fee should be applied first to the principal and interest owing on the Len-Mac Note. If 80 percent of the contingent fee is sufficient to pay the principal and interest owing on the Len-Mac Note on the day the contingent fee would otherwise have been payable to Len-Mac, then any remaining amounts of the 80 percent of the contingent fee should be applied to the principal and interest owing on the Stutz Road Note on the same date. Interest on any principal not covered by the 80 percent of the contingent fee would continue to accrue. The remaining twenty percent of the contingent fee would be the amount owed to Len-Mac under the Residential Development Agreement.

We sustain Len-Mac's first issue and Stutz Road and White's third issue.

### ATTORNEY'S FEES

In the second cross-issue, Priority contends the trial court erred by awarding Len-Mac attorney's fees of $206,163 on its claim for breach of the Residential Development Agreement. Priority contends Len-Mac failed to meet the prerequisite of presentment of the claim, failed to segregate the attorney's fees for recoverable claims from the fees attributable to the claims on

which it did not recover, and failed to present sufficient evidence of the fees.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.002(2) (West 2015) (presentment-of-claim requirement); *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014) (per curiam) (sufficiency of evidence of time spent on specific tasks); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 312–14 (Tex. 2006) (segregation of fees).  Because we reverse the trial court's awards of damages in this case, we also reverse the awards of attorney's fees.  *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004) (per curiam); *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 242 S.W.3d 67, 75 (Tex. App.—San Antonio 2007, pet. denied).  Accordingly, we do not address Priority's arguments.

## COLLATERAL ASSIGNMENT

Len-Mac contends in its second issue that the trial court erred by granting Priority's motion for judgment on the collateral assignment of the Stutz Road Note.  Priority's prayer in the motion asked that any amount it owed Len-Mac for the contingent fee be reduced in the judgment by the amount owed for principal and interest on the Stutz Road Note.  The trial court's order granting the motion stated that all amounts Stutz Road owed to Priority in connection with the $600,000 note "shall be applied to and shall reduce the amounts that [Priority] owes to [Len-Mac]."

Len-Mac appears to argue that Priority's failure to account for the contingent fee meant that the collateral represented by the collateral assignment, the contingent fee, never came into existence.[9]  Len-Mac's argument appears to be based on evidence that Priority did not set up an accounting system to determine the amount of Project Available Cash or the contingent fee. Because the contingent fee never came into existence, Len-Mac asserts, it was not retained by

---

[9] Priority states that "Len-Mac's articulation of this argument is nearly indecipherable."  We do not disagree.  The legal arguments Len-Mac asserts are not clear, and to the extent we may have misstated them and misunderstood the import of the arguments, we conclude they are waived for improper briefing.  *See* TEX. R. APP. P. 38.1(i) (brief must contain a "clear" argument for the contentions made).

Priority. Thus, Len-Mac concludes, the jury's finding of $1,037,000 as the amount of the contingent fee should be considered a finding of damages for Priority's failure to account for and to pay the contingent fee. We disagree. The contingent fee was a concept created by the Residential Development Agreement. Regardless of whether Priority took steps to account for the contingent fee, the contingent fee was 60 percent of the difference between the receipts and the acquisition and development costs. Priority's failure to set up an accounting system to determine the amount of the fee does not mean the fee did not exist or that it was not collateral securing payment of the notes. To the extent the contingent fee was not paid to Len-Mac, it was retained by Priority. It was undisputed that Priority did not pay any amount of the contingent fee to Len-Mac; therefore, Priority retained the entire amount. To the extent Len-Mac argues the jury's finding was a finding of the damages Len-Mac suffered, we disagree. As discussed above, the jury was not instructed to find damages. The jury's finding of "the Contingent Fee" was specifically the amount of the contingent fee under section 5.03 of the Residential Development Agreement, and nothing more.

We overrule Len-Mac's second issue.

### CONCLUSION

We reverse the trial court's judgment in part. We reverse the trial court's judgment on Priority's claims against Len-Mac and Stutz Road for breach of the notes and against White for breach of the guaranties, and we reverse the trial court's judgment on Len-Mac's claim against Priority for breach of the Residential Development Agreement for Priority's failure to pay the contingent fee, if any, owed to Len-Mac. We also reverse the trial court's awards of attorney's fees to all parties. In all other respects, we affirm the trial court's judgment. We remand the cause to the trial court for further proceedings. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 51 (Tex. 1998) ("[B]ecause there is no legally

sufficient evidence to support the entire amount of damages, but there is some evidence of the correct measure of damages, we . . . remand the cause for a new trial.").

131752F.P05

/Lana Myers/
LANA MYERS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

| | |
|---|---|
| STUTZ ROAD LIMITED PARTNERSHIP AND WILLIAM D. WHITE, III AND LEN-MAC DEVELOPMENT CORPORATION, Appellants | On Appeal from the County Court at Law No. 2, Dallas County, Texas Trial Court Cause No. CC-10-01696-B. Opinion delivered by Justice Myers. Justices Bridges and Francis participating. |

No. 05-13-01752-CV          V.

WEEKLEY HOMES, L.P. D/B/A DAVID WEEKLEY HOMES AND PRIORITY DEVELOPMENT, L.P., Appellees

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** the trial court's judgment as to appellee Priority Development, L.P.'s causes of action against appellant Len-Mac Development Corporation for breach of the Len-Mac Promissory Note and against appellant William D. White, III for breach of his guaranty of the Len-Mac Promissory Note. We **REVERSE** the trial court's judgment as to appellee Priority Development, L.P.'s causes of action against appellant Stutz Road Limited Partnership for breach of the Stutz Road Promissory Note and against appellant William D. White, III for breach of his guaranty of the Stutz Road Promissory Note. We **REVERSE** the trial court's judgment as to appellant Len-Mac Development Corporation's cause of action against appellee Priority Development, L.P. for breach of the Residential Development Agreement for failure to pay the Contingent Fee under Section 5.03 of the Residential Development Agreement. We also **REVERSE** the trial court's awards of attorney's fees to all parties. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 4th day of November, 2015.